## Kenmont Coal Company et al. v. Summers et al.

(Decided May 24, 1932.)

CRAFT & STANFILL and C. S. LANDRUM for appellants.

G. C. WILSON for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

On the death of Mack Summers, an employee of the Kenmont Coal Company, his widow and children applied to the Workmen's Compensation Board for compensation. The board found that Summers' death was not due to an accident arising out of and in the course of his employment, and denied compensation. On petition for review the Perry circuit court set aside the award and rendered judgment· for the applicants in the sum of $4,000. The coal company appeals.

The evidence may be summarized as follows: Appellant's property adjoins the village of Jeff, and in some places is only a few feet therefrom. In the village are a depot, theater, pool room, barber shop, and some storehouses and residences, all of which are operated or owned by others, and none of which belong to, or are operated by, the coal company. The company gets its mail in Jeff, and some of its employees board at the hotel there. It also delivers groceries and feed to its employees in Jeff, and at times its camp doctors have lived there and have attended the company's employees there. The company also sold electric current to two parties, who, in turn, furnished it to the inhabitants of Jeff at a profit of 40 per cent. Those operating the theater, barber shop, and hotel accepted scrip that had been issued by the company the same as if it were United States coin. Picture shows were conducted at the theater on Wednesdays, Saturdays, and Sundays, and were patronized by the company's employees as well as others.

At the time of his death, Summers was employed as tipple foreman, and as such it was his duty to look after the tipple and the carpenters and teams. For this service he was paid $175 a month. About the time he accepted employment with the company he was appointed a deputy sheriff of Perry county under his brother-in-law, the sheriff. As part of his contract with the company, Summers, as deputy sheriff, was to protect the company's property and preserve peace among its employees. Just before dark on Sunday evening, December

234

23, 1928, Summers, who had been to Hazard in his machine, returned with others to his home in the company's camp. While there some shots were fired near the tipple, and Summers went toward that point. Shortly thereafter he returned to his home and proceeded in his machine with two parties to Jeff, where he had been advised there was some trouble. On his arrival at Jeff he went into a restaurant where he remained for a few minutes. Shortly thereafter he entered the theater and asked the ticket collector if he had seen any drunken persons, and was told that there had been in the theater two boys, who were either drunk or sick, and that one of them had gone out holding a handkerchief to his mouth. While there he inquired of Hiram Pratt who the two boys were. One of the boys was Ray Pennington, who, a few minutes later, shot and killed Summers. Summers then followed Pennington in the direction of a store in the village. Pennington had the appearance of being drunk. A witness by the name of Chalmers Henry saw the two boys, one of whom was Ray Pennington, come out of Pete Davidson's restaurant, and heard Summers call to them three times to halt. When this occurred, the boys, or one of them, turned and ran up the railroad toward the restaurant of Dan Kilburn. When last seen, the boys were running up the river away from the camp, and Summers was right after them. Pennington was drunk and staggering. Riley Wells saw Summers on the highway bridge some 60 or 75 yards from Kilburn's restaurant, and Summers asked him if he saw a man running that way, saying that he had been pursuing some one, who had been bootlegging liquor right under his nose. After talking a few minutes, Wells and Summers turned and went into Kilburn's restaurant. Summers remained there only a minute, then opened the door and went out. Several shots were fired, and witness found Summers lying on the state highway dying. He did not hear any words spoken before the shooting, and Summers did not command any one to halt. There was further evidence that Pennington shot and killed Summers, and was subsequently convicted of the crime. Pennington was not an employée of the coal company and did not live in the coal camp. There was rumor to the effect that Pennington had been bootlegging in the camp. It was not shown that Summers had seen Pennington bootlegging in the camp, or that he had a warrant for Pennington's arrest.

According to Sam Cornett, who was also deputy sheriff, Mack Summers was working for the Kenmont Coal Company as tipple foreman and deputy sheriff, but was not paid anything for his services as deputy except statutory fees, which included arrests for drunkenness. Mack Summers was killed at the intersection of the road leading from Jeff to the Kentucky-Virginia highway, about one-eighth of a mile from the Jeff depot, and approximately one-quarter of a mile from the property of the Kenmont Coal Company. J. L. Bishop, the company's superintendent, deposed that it was Summers' duty to make arrests if he saw anybody violating the law, and do the work generally of a peace officer in the camp. Occasionally Summers went beyond the camp on errands for the company, but not as a peace officer. His instructions to Summers as peace officer for Kenmont were that he was to do no work outside the camp. His duties were to preserve the peace among the employees and protect the company's property in the camp. He had given such instructions to Summers many times. He had also gotten after Summers about going out of the camp and told him not to do so. During the ten years he had been employed by the Kenmont Coal Company it had never been costomary for the peace officers to do any work for the company outside of the camp, but they had all been told not to go outside of the camp. According to William Cornett, the sheriff under whom Summers served as deputy, the duties assigned to Summers when he and Bishop and Summers were together were that Summers should work around the tipple at the camp to protect the pay roll, and act as general peace officer of the camp. He was to be a general peace officer among the men and protect all the property. Since he had been sheriff of Perry county, it had been the custom of the deputy, who worked for the coal company, to do the work of peace officer in preserving order among the employees of the company in their congregations and social gatherings, including the families of the employees down in the village of Jeff, as well as up in the camp property. There was nothing said by Mr. Bishop at the time Summers was employed about what territory he was to work in, and beyond which he was not to go. While working for Kenmont Coal Company Summers had accompanied him on liquor raids in the latter's territory in Perry county. If Summers had arrested Pennington on the night of the killing, and Pennington had been convicted on the charge of drunken-

ness, Summers would have received $5. It was his custom to use the deputies of the coal company in making raids in the vicinity where they were employed. Dr. K. N. Salyers, who was county judge of Perry county during the time that Summers was employed as deputy sheriff, testified that Summers was appointed deputy by Sheriff William Cornett. He recalled that on one occasion he went with Summers and found a lot of home-brew, which they destroyed. He did not remember giving any instructions to Summers. He remembered Summers claiming that the coal company was "kicking" on his going down to Jeff, as they were not paying him for it. Summers was paid several $5 fees for arrests on charges of drunkenness.

Assuming that the case was reviewable, the circuit court found that Summers was killed as the result of an accident arising out of and in the course of his employment, and based its conclusion on the following facts: The village of Jeff was the natural and logical recreation center of the company's employees. From 75 to 90 per cent of the patrons of the pool room, barber shop, picture show, etc., were employed by the company. The company received a profit from the handling of its scrip by the barber shop and picture show, and also a profit from the electrical current which it furnished in Jeff. There is no line of demarcation showing where the coal company's line stops and the other property lines in the village of Jeff begin. The road from the company's main buildings and property leads across its spur track and around its property to the main state highway, a distance of one-fourth to one-half mile. It was customary for the company's peace officer, prior to the employment of Summers, and of Summers after his employment, to patrol the town of Jeff and to preserve peace and quiet among the company's employees there. On the afternoon he was killed, Summers was told that there was a disturbance at the picture show in Jeff. He went with the company's employees to Jeff and to the picture show, where some one was drunk. The picture show was about 20 or 25 feet from the company's property line. While there two men appeared in the crowd in a drunken condition, and Summers was seen to go through the crowd toward the main office of the Company in pursuit of the man, after commanding him to halt. The two men dodged back through a building and started down the railroad track away from the company's camp, and on out

through the town of Jeff beyond the depot and post office toward the state highway at a point where the road from the company's camp intersects the highway. Near this intersection, and some 400 or 500 feet from the property line of the company, Summers was shot and killed by Ray Pennington, one of the men pursued, who was a notorious bootlegger, and a frequent visitor at the company's camp.

The question, whether an employee acting as peace officer, though also a public officer, is within the provisions of the Workmen's Compensation Act (Ky. Stats., sec. 4880 et seq.), has been before the court in several cases. In Reliance Coal & Coke Co. v. Smith, 206 Ky. 320, 266 S. W. 1094, Smith, who was also a deputy sheriff, was employed by the company as a watchman and preserver of the peace in the company's camp. While engaged in quelling a disturbance in one of the company's houses in the camp, he was shot and killed. The Workmen's Compensation Board found that the accident arose out of and in the course of Smith's employment, and the award was affirmed by the circuit court. On appeal it was held that the evidence that Smith's principal employment was to maintain peace and order in the camp supported the finding of the Compensation Board that he met his death while acting as the company's employee, notwithstanding he was deputized by the sheriff of the county. In Stearns Coal & Lumber Co. v. Ball, 218 Ky. 607, 291 S. W. 1013, the facts were these: The company had erected a public assembly hall where moving pictures were regularly shown. Ball, a county patrolman, was paid a salary by the company to keep the peace in the mining town and protect its property. While its employees were assembled in the building they were disturbed by persons discharging firearms immediately in front of the building. While trying to arrest them, Ball was killed. Compensation was awarded, and on review by the circuit court the award was affirmed. On appeal we held that Ball's death occurred by an accident arising out of and in the course of his employment, and affirmed the judgment. In Wilson Berger Coal Co. v. Metcalf, 231 Ky. 93, 21 S. W. (2d) 112, Metcalf, who was also a deputy sheriff, was employed by the coal company as peace officer. While quelling a disturbance between two of the coal company's employees and others about 20 yards from the company's premises, he was shot and killed. Compen-

sation was denied by the Compensation Board, but allowed on appeal. As the uncontradicted evidence showed that Metcalf was employed to preserve the peace not only in the company's camp, but around the camp, we held that the accident arose out of and in the course of his employment, and affirmed the judgment. The reason for the ruling was that the facts were undisputed, thus presenting a question of law reviewable by the courts. But the case before us presents an entirely different situation. In dealing with the question, the court took into consideration numerous circumstances tending to show that Summers' duties required him to act as a peace officer in Jeff, and overlooked entirely the evidence to the contrary. Even if the courts were permitted to set aside the finding of the Compensation Board on the ground that it is flagrantly against the evidence, it may be doubted if such a case is presented. But that is not the rule. On the contrary, the rule is that, unless there is an entire absence of evidence to support the board's finding of facts, its finding in the absence of fraud is conclusive and not subject to review. Northeast Coal Co. v. Castle, 202 Ky. 505, 260 S. W. 336. On the one hand we have the facts relied on by the chancellor. On the other hand, we have the positive statement of the company's superintendent that Summers was employed to preserve peace among the company's employees, and to protect their property only in the camp, and that he was repeatedly instructed not to do any work on behalf of the company outside of the camp, coupled with Summers' statement to the county judge that the company did not want him to take care of Jeff, and was "kicking" on his going down there. Clearly the least that can be said is that on the question whether, at the time he was killed, Summers was acting as a peace officer on behalf of the company, or in his official capacity as a deputy sheriff, was conflicting, thus presenting a case where the finding of facts by the Compensation Board was conclusive, and not subject to review. It follows that the award of the Compensation Board should have been affirmed.

Judgment reversed, and cause remanded for proceedings not inconsistent with this opinion.