## Black Mountain Corporation v. Pace et al.

(Decided Jan. 26, 1934.)

B. M. LEE for appellant.

J. C. BAKER and C. B. SPICER for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The appellant and plaintiff below, Black Mountain Corporation, operates a coal mine in Harlan county, Ky., situated one and a half or two miles from the town of Evarts, which is one of the fifth class. From it a spur track of the Louisville & Nashville Railroad runs to the tipple and plant of plaintiff; but it does not own the spur track, nor has it anything to do with its operation, maintenance, and upkeep; and uses it no dif-

ferently than any other one who sees proper to employ
it in the hauling of freight, the greater portion of which
consisted of coal transported from plaintiff's mine to
the market. In the early part of 1931 there arose some
disturbances among laboring miners, not only at the
plant of plaintiff, but in other places in Harlan and
other counties in Eastern Kentucky; so much so that
the operators of the mines deemed it wise to employ
guards to protect the property of their plants and other-
wise preserve peace and order therein. A number of
such were employed by plaintiff, and they worked in
two shifts, one at night from 6 p. m. until 6 a. m. the
next day, and the other in the daytime between the same
morning and evening hours. Generally, but not exclu-
sively, deputy sheriffs were so employed, or they were
appointed such after their employment by the sheriff of
the county, and which was for the purpose of enabling
them to make arrests during the hours of their service,
under the same circumstances and with the same protec-
tion that a peace officer might do; also that they might
execute process within the limits of the territory which
they were guarding.

On March 19, 1931, plaintiff employed Jesse Pace,
a deputy sheriff of Harlan county, to serve as such
guard for it between the hours of 6 p. m. and 6 a. m.,
and for which he was paid 40 cents per hour. He had
previously worked for the plaintiff in the same capacity,
but had been away for some time before accepting the
second employment. Its contract with Pace was verbal,
and only four persons were present, E. B. Childers, the
superintendent of plaintiff, Pace, Jim Daniels, and Jesse
Johnson; the last two were then serving as guards, but
one of them (Daniels) has since died. Childers testi-
fied that he employed Pace "to help watch our prop-
erty at night, especially the head house and camp," and
that his duties in serving his employer (plaintiff) in the
capacity of guard did not extend beyond the boundaries
of its property, but which perhaps might include im-
mediately contiguous territory, if it became necessary
to carry out and accomplish the purpose of his employ-
ment. Jesse Johnson, who was introduced by plaintiff,
did not dispute the contract of employment as testified
to by Childers, although he told about what occurred
when Pace was employed. He had accepted similar em-
ployment a few days before, and he left a short time
thereafter, and, in stating the instructions given to him

at the time of his employment, he said: "Well, they told us there was a bunch of fellows there agitating mine trouble, and they were expecting trouble, and that they wanted us there to keep down trouble," and which was to protect the laborers of plaintiff on the ground as well as to protect the property from destruction by fire, dynamite, or other causes. The substance of the contract so made with Pace at the time of his employment was given by others as the one made with them when they were employed in a similar capacity. Jesse Johnson was asked this question: "And is it not a fact that these officers and guards for Black Mountain Corporation, Jesse Pace and others, operated about as much around Evarts as you did at Black Mountain?" To which he answered: "No, we were more active in Black Mountain," and he never said that the duties of his position as guard required of him, or any other similarly employed, to undertake to enforce the law at Evarts or any place located that distance from the property of plaintiff.

A short while before April 17, 1931, some disaffected miners whipped Charlie Carpenter one night in Evarts, and on that date Carpenter and one Thompson, who was present and witnessed the whipping, went to Harlan and swore out a warrant charging four persons with confederating and banding themselves together for the purpose of so assaulting him. That warrant was issued in the afternoon; but in the forenoon of that day Pace, Daniels, and one or two other guards in the employ of plaintiff went to Harlan to answer a proceeding to put them under a peace bond which others had inaugurated. They were dismissed by the court, and Pace left for the scene of his employment, following which warrants were obtained for those charged with whipping Carpenter. They were given to J. H. Blair, the sheriff of the county, to execute and he turned them over to Jim Daniels, who was the deputy sheriff as well as guard at the plant of plaintiff and had been for five or more years. He instructed Daniels to summon a sufficient number of deputy sheriffs to insure the serving of the warrants, and he summoned twelve for that purpose, one of whom was Pace. After Blair delivered the warrants to Daniels in Harlan, the latter telephoned for Pace, who was then off duty, to come to Harlan and start from thence to Evarts where the defendants in the warrant were supposed to be, and each of whom were

known only by Daniels, for which reason Blair delivered the warrants to him. It was necessary for Pace to leave the plant of plaintiff and get with the crowd, either when it started or on its way, because Evarts is between Harlan and the plant of plaintiff. Pace, with the other members of the posse of deputy sheriffs, departed from Harlan for Evarts, and when they arrived there Daniels discovered one of the defendants in one of the warrants and he and others arrested him from among several who were located by the side of a road or street in Evarts. Some of those who were present with the arrested prisoner ran behind a gondola coal car on the spur track and commenced shooting from that point when Daniels directed Pace and another guard by the name of White to go around the car and ascertain what the shooting was about, and if it was unlawful to apprehend the offenders. One of those behind the car shot Pace as he emerged in sight, from the effects of which he shortly died, and his widow and some dependent children made application to the Workmen's Compensation Board for an award on account of his death.

Plaintiff resisted the award upon two grounds: (1) That Pace had never signed any register or other writing accepting the benefits of our Compensation Law (Ky. Stats. sec. 4880 et seq.); and (2) that his death did not arise "out of and in the course of his employment." Upon the evidence introduced before it the board denied both those defenses and awarded the dependents (to whom we shall hereafter refer as defendants) $12 per week for 335 weeks; thereupon plaintiff filed this review action against defendants and the board in the Harlan circuit court, and upon final submission it affirmed the award of the board, and complaining of it plaintiff prosecutes this appeal. The court in affirming the award of the board made no comment upon the testimony introduced, nor did it discuss any of the facts or any principle of law applicable thereto; but the board did give a resume of the testimony and found that the superintendent of plaintiff made application to the sheriff of the county at the times Pace and others were employed as guards, and "that he desired to employ some deputy sheriffs or persons clothed with power of arrest as guards *in the camp of his company*" (our italics), and which is in accord with our interpretation

of the uncontradicted evidence to which we have referred.

The board also found: "That the deceased was not upon the property of the defendant company at the time he was murdered, but that he was on a spur track of the Louisville & Nashville Railroad Company, which led into the property and mines of defendant (plaintiff) company, and which spur was not used except to transport goods and timbers into the mines and coal therefrom." But it did not find that plaintiff owned the spur track. However, the question of its ownership we regard as immaterial, since Pace was killed while engaged in no effort to protect any of that property. It figures in this case solely as designating the spot where he was killed. The only circumstances upon which the board based its conclusion that Pace was killed "in the course of his employment" were: That Jim Daniels was along and, as the board found, leading the posse of deputy sheriffs; that Daniels had formerly directed the work of the guards "at the mines"; that the superintendent of plaintiff was in Harlan on the day the warrants were sworn out for the arrest of those whom the posse was seeking, and that Charlie Carpenter, whom the charged offenders had whipped, was in the employ of plaintiff as a miner, though at the time of the whipping (in the night) he was off duty and away from plaintiff's premises. The board said that such facts tended "to show that the deceased, Jesse Pace, came to his death in the regular course of his employment and that his injury arose out of said employment." What we have related constitutes the entire comment, as well as the finding of facts by the board bearing on the question of whether or not Pace, when he was killed, was performing the duties for which he was employed, and for which he was being paid by plaintiff.

Such finding, as we view the record, was in the face of all the testimony introduced at the hearing before the board, and considered by the Harlan circuit court. Every witness testified that, even during the hours of employment of the guards (which in Pace's case was during the nighttime), they, as deputy sheriffs, were subject to the call of the sheriff of the county to perform official duties, and, of course, when they were so taken away, they ceased to serve their master and became public officers in the service of their principal, the sheriff of

the county, and the proof also shows that when so serving they were paid as other public officers are paid for such services. Of course, if such official service should be performed on the territory to guard which they were employed, and in the execution of such duties as they were expected to perform as guards, then there would be no trouble whatever in the case, and which condition was the one found to be true in the instances wherein we have upheld awards in such cases. But neither we, nor any other court, so far as we have been able to discover, have adjudged compensation to an employed guard on the premises of the employer when the employee was serving as a public officer at the behest of his principal at a place entirely removed from the premises of the employer, and when the public duty being performed was in furtherance of the enforcement of the law for the benefit of all citizens alike and not for the special benefit of a single individual, the employer.

Moreover, the uncontradicted testimony in this case shows that the hours of Pace's employment were between 6 p. m. and 6 a. m., and the rest of the 24 hours (during which he was killed) was his own time to do with as he saw proper, and during which the sheriff could command him without interfering with his employment as guard for plaintiff. The fact that the attempted service of the warrants in this case was at a place not far removed from plaintiff's premises cannot be considered as one having determinative effect upon the issue involved any more than if it had been twenty-five or more miles from defendant's property. Possibly compensation would be due if the guard, as deputy sheriff, having jurisdiction throughout the county, began pursuit of an offender for a violation occurring upon the grounds of his employer, and which was continued to the spot where the injury occurred. In the latter instance it might be true (but which we do not now decide) that the injured guard, or his dependents if he were killed, could collect compensation upon the ground that he sustained his injuries or death "in the course of his employment."

Questions similar to the ones we have here were involved in the recent case of Kenmont Coal Co. v. Summers, 244 Ky. 232, 50 S. W. (2d) 515, 517. The facts therein were much more persuasive that Mack Summers, the deceased guard and deputy sheriff, was killed

in the course of his employment than is disclosed by the testimony in this case. The board found that he was not, but its finding was reversed by the circuit court to which the case was carried for review. On appeal to this court we reversed the judgment and directed the finding of the board to be reinstated. We will not rehearse the facts of that case, but refer the reader to the opinion for such information. In the course of it we said: "In dealing with the question, the court took into consideration numerous circumstances tending to show that Summers' duties required him to act as a peace officer in Jeff, and overlooked entirely the evidence to the contrary." The evidence referred to was that he had no jurisdiction as guard beyond the premises of his employer, and that he was killed about twenty feet therefrom. So, it may be said here that both the board and the circuit court failed to take into consideration the evidence in the case relating to the terms of Pace's employment and the territory over which he was to serve as guard. The court also said in that opinion: "Even if the courts were permitted to set aside the finding of the Compensation Board on the ground that it is flagrantly against the evidence, it may be doubted if such a case is presented." Further along in the opinion this language was employed: "On the one hand we have the facts relied on by the chancellor. On the other hand, we have the positive statement of the company's superintendent that Summers was employed to preserve peace among the company's employees, and to protect their property only in the camp."

Compare also the case of Wilson Berger Coal Co. v. Metcalf, 231 Ky. 93, 21 S. W. (2d) 112, and Stearns Coal & Lumber Co. v. Ball et al., 218 Ky. 607, 291 S. W. 1013. An examination of those opinions will disclose that compensation may be allowed when the injured or killed guard was off the premises of his employer, if at the time he was performing an act essentially within the scope of his duty as guard, and when he was functioning as such. But it is always denied when the injury to, or death of, the guard occurs when he is acting solely in his capacity as an officer entirely away from the premises of his employer and at the direct behest of his principal, the sheriff, since he is not then performing the duties of guard for his master, but only discharging his duties as a deputy officer and for which compensa-

tion will not be allowed against the master for injuries sustained.

Counsel for defendants seem to overlook the fact that Pace at the time he was killed was serving in two entirely distinct capacities—one as an employee of plaintiff, and the other as deputy sheriff under his principal, the sheriff. If those duties intermingled on the premises of the employer, or in the performance of any act in furtherance of the protection of the property of his employer, or the preservation of the peace and good order among his employees and upon or near his premises, then it truthfully could be said that the injured or killed employee acting as guard for his master (or his dependents if he was killed) should receive compensation, because the injury was sustained and arose out of the employment. But where the act being performed was wholly independent of such matters, and occurred while the employee was off duty for his master, and while he was obeying specific directions from his superior officer in the discharge of exclusive official duties, then no such compensation may be allowed, because the injury was not sustained in the course of the employment, nor did it arise out of it.

The facts upon which the board seem to have placed emphasis are not entitled to the effect it gave them. The superintendent, though in Harlan on the day the warrants were taken out, was there according to the proof for another purpose. But, even if he had been instrumental in procuring them, he would have been doing nothing more than any good upright citizen should have done in an effort to suppress lawlessness and to establish peace and good order in the community. Neither do we attach any significance to the fact that Daniels directed Pace to go behind the car at the time he was shot for the purpose stated, nor to the fact that some witnesses stated that they were, while serving as guard, directed to obey the instructions of Daniels. If such direction was given (but which is disputed), it only applied to the execution of the duties as guard, and not to the execution of those as deputy sheriff when not serving in the capacity as guard. It was Blair, the sheriff, who put Daniels in charge of the posse of deputy sheriffs on the occasion involved, and not plaintiff or any of its officers, and to hold that our Compensation Statute embraces the case before us would not only divert its

purpose far afield, but, carried to its logical conclusion, would render all employers of deputy sheriffs liable to compensation whenever and wheresoever their employees were injured or killed in the performance of their official duties, howsoever much they might be disconnected from the duties of their employment as guards.

The cases cited and others referred to therein, together with Broadway & Fourth Avenue Realty Co. v. Metcalf, 230 Ky. 800, 20 S. W .(2d) 988; Stearns Coal & Lumber Co. v. Smith, 231 Ky. 269, 21 S. W. (2d) 277; Wilson Berger Coal Co. et al. v. Brown, 223 Ky. 183, 3 S. W. (2d) 199, and others cited therein, establish the rule to be that, where the facts are undisputed, as we have found to be true in this case, the question becomes one of law for the determination of the court. That being true, we see no escape from the conclusion that the death of the decedent in this case did not occur in the course of his employment, nor did it arise out of it, which renders it unnecessary to determine the other question in the case.

Our sympathies for the widow and dependent children is cause for regret that our holding must be such as to put them beyond the pale of the statute; but we did not enact it, nor are we authorized to do any more than construe it as it was enacted.

Wherefore, for the reasons stated, the judgment is reversed, with directions to set it aside and to render one remanding the case to the Compensation Board for proceedings not inconsistent with this opinion.